**2016 IL 118973**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

—————————————

(Docket No. 118973)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TARON R. BURNS, Appellee.

*Opinion filed March 24, 2016.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Freeman, Burke, and Theis concurred in the judgment and opinion.

Chief Justice Garman specially concurred, with opinion.

Justice Thomas dissented, with opinion, joined by Justice Karmeier.

## OPINION

¶ 1       The circuit court of Champaign County determined that the warrantless use of a drug-detection dog at 3:20 a.m. at defendant's apartment door, located within a locked apartment building, violated defendant's rights under the fourth amendment to the United States Constitution. U.S. Const., amend. IV. The appellate court affirmed. 2015 IL App (4th) 140006. We now affirm.

¶ 2                                    BACKGROUND

¶ 3        Defendant, Taron R. Burns, lives in unit No. 10 of a three-story apartment building located at 409 W. Elm, Urbana, Illinois. The apartment building contains twelve units and is secured by two locked entrances located on the east and west sides of the building. The apartment building common areas are not accessible to the public. Defendant lives on the third floor of the apartment building. Her floor consists of a small landing with two apartments, unit Nos. 9 and 10, and a storage closet. The apartment doors to unit Nos. 9 and 10 are located directly across from one another, and the storage room door faces the stairwell.

¶ 4        On November 29, 2012, the Urbana police department's Crimestoppers hotline received an anonymous tip that defendant was selling marijuana. The tipster indicated that defendant sold approximately two pounds of marijuana a week and received shipments of marijuana from her brother (name unknown) in California. According to the tipster, defendant received a shipment of two pounds of marijuana on November 21, 2012. The tipster also indicated that defendant sold ecstasy to the tipster's girlfriend.

¶ 5        Investigating the tip, Urbana police detective Matthew Mecum discovered that in October 2008, defendant was issued a notice to appear from the city of Urbana for possession of marijuana and drug paraphernalia. Defendant was also arrested in 2003, for possession of marijuana in a neighboring town, Villa Grove, Illinois. Detective Mecum also observed "pictures containing images for the legalization of marijuana," "a picture containing actual marijuana," and "a picture containing large amounts of U.S. currency" on defendant's personal social media page.

¶ 6        Sometime after midnight on January 10, 2013, Detective Mecum went to defendant's apartment building to "confirm her address." Detective Mecum wore jeans and a winter jacket, not displaying any law enforcement indicia. Detective Mecum's badge and firearm were not visible. Detective Mecum had visited the apartment building several times and always found the entrance doors locked. According to Detective Mecum, he knocked on the door and an unidentified tenant let him in the building. While walking through the apartment building, Detective Mecum observed a package addressed to defendant with a shipping label identifying the sender as "Ben Jones in Oakland, California." Detective Mecum did not indicate where in the building he observed the package or the dimensions of the package.

¶ 7        At approximately 3:20 a.m., Officer Michael Cervantes entered defendant's apartment building, without a warrant, with his drug-detection dog. The dog is trained in the detection of cocaine, marijuana, methamphetamine, and heroin. Officer Cervantes was admitted into the building by Sergeant Loschen. Officer Cervantes did not know how Sergeant Loschen obtained access to the apartment building. Officer Cervantes took his drug-detection dog to the third floor and the dog alerted to the presence of narcotics at defendant's apartment door. The affidavit for a search warrant in this case states that as Officer Cervantes and his dog were exiting the apartment building, Officer Cervantes used his drug-detection dog "to conduct an open air sweep of the doors to two apartments located on the west side of the first floor of the building." Officer Cervantes testified during the hearing on defendant's motion to suppress that using his drug-detection dog, he "started on the third floor, swept Number 9, the storage unit in the middle between 9 and 10, swept 10, proceeded to the alert that my canine detected an odor of illegal drugs, and then on the way out I swept 2 more apartment doors on the first floor on the west side." Officer Cervantes did not explain why he swept these other apartments' doors for drugs.

¶ 8        Later that same day, Detective Mecum applied for a search warrant for defendant's apartment. The complaint and affidavit for search warrant indicated that on November 29, 2012, the Urbana police department received a Crimestoppers tip that defendant was receiving shipments of marijuana from her brother (name unknown) in California; that defendant received a shipment on November 21, 2012; that defendant sold ecstasy to the tipster's girlfriend; that defendant sells approximately two pounds of marijuana a week; and that defendant has a personal social media page showing United States currency. The complaint and affidavit for search warrant does not indicate that the tipster provided defendant's address.

¶ 9        The complaint and affidavit for search warrant also indicated that in October 2008, defendant was issued a notice to appear from the city of Urbana for possession of marijuana and drug paraphernalia; that defendant was arrested in 2003, for possession of marijuana in Villa Grove; and that defendant's personal social media page contained "images for the legalization of marijuana" as well as "a picture containing actual marijuana" and "a picture containing large amounts of U.S. currency." The complaint and affidavit for search warrant stated that on "January 10, 2012 [*sic*]," Officer Michael Cervantes used his drug-detection dog to conduct a sweep of defendant's apartment door, along with three additional

apartment doors and a closet door, and that the dog alerted to drugs at defendant's apartment door. Detective Mecum stated in the complaint and affidavit for search warrant that on January 10, 2013, while walking through the apartment building, he observed a package addressed to defendant at "409 W. Elm #10" with a return shipping label listing "a Ben Jones in Oakland California." Detective Mecum also stated that the only apartment without a number on the door is on the third floor directly across from unit No. 9, and he subsequently confirmed that unit No. 10 is located on the third floor. The trial judge granted the search warrant application and the police searched defendant's apartment later that day, resulting in discovery of marijuana.

¶ 10    On January 11, 2013, the State charged defendant with unlawful possession with intent to deliver between 500 and 2,000 grams of cannabis (720 ILCS 550/5(e) (West 2012)), a Class 2 felony. Defendant filed a motion to suppress the evidence, arguing that the dog sniff of the entrance to her apartment violated the fourth amendment under *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013). The trial court issued a written order granting defendant's motion to suppress. The trial court found that *People v. Trull*, 64 Ill. App. 3d 385, 387 (1978) (holding that police officers' warrantless entry into a defendant's locked apartment building violated the defendant's fourth amendment rights and that evidence found after officers entered the apartment building must be suppressed) had not been overruled and was controlling authority.

¶ 11    The trial court also noted that both the authors of the majority and the dissenting opinions in *Jardines* recognized that the implied invitation or license for an individual to approach the door to a home would not extend to a stranger, with or without a dog, who approached the door without a specific invitation in the middle of the night. The trial court determined the dog sniff conducted by Officer Cervantes and his dog in the middle of the night "violated the no-night-visits rule referred to in the *Jardines* decision."

¶ 12    The trial court's order further noted that the complaint and affidavit for search warrant erroneously stated that the canine sweep occurred a year earlier, on January 10, 2012, and was sworn to by Detective Mecum with the erroneous statement uncorrected. The court held that "[t]he sniff of Defendant's apartment door, located within a locked apartment building, at 3:20 a.m. on January 10, 2013, violated Defendant's Fourth Amendment rights." The court further determined that the remaining facts pleaded in the complaint and affidavit for search warrant were

insufficient to establish probable cause for issuance of the search warrant requested, and that the good-faith exception to suppression was not applicable to the facts of this case.

¶ 13    The appellate court affirmed, concluding that the search warrant was issued on the basis of an unconstitutional warrantless dog sniff. The appellate court further concluded that the recovered marijuana was "fruit of the poisonous tree and the exclusionary rule applies." 2015 IL App (4th) 140006, ¶ 65. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 14                                   ANALYSIS

¶ 15    The State appeals from the judgment of the appellate court affirming the trial court's order granting defendant's motion to suppress. This court gives great deference to the trial court's findings of fact when ruling on a motion to suppress. *People v. Cregan*, 2014 IL 113600, ¶ 22. We will reverse the trial court's findings of fact only if they are against the manifest weight of the evidence. *Cregan*, 2014 IL 113600, ¶ 22. Here, there is no dispute concerning the trial court's factual findings.

¶ 16    The trial court's legal ruling on whether the evidence should be suppressed is reviewed *de novo*. *People v. Bridgewater*, 235 Ill. 2d 85, 92-93 (2009). The question of law at issue in this appeal is whether the warrantless use of a drug-detection dog at an apartment door, located within a locked apartment building, in the middle of the night, violated defendant's fourth amendment rights. We review this question of law *de novo*. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

¶ 17             I. Whether Defendant's Fourth Amendment Rights Were Violated

¶ 18    The State argues that use of the drug-detection dog did not violate defendant's fourth amendment rights because it did not occur in defendant's home or its curtilage. According to the State, the officers conducted a dog sniff on the landing outside of defendant's apartment door. The State contends that the landing was not part of defendant's curtilage. Defendant counters that use of the drug-detection dog at the entrance to her apartment was unreasonable and violated both the fourth amendment to the United States Constitution (U.S. Const., amend. IV) as well as

the search and seizure provisions of article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6).

¶ 19    The fourth amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Similarly, the Illinois Constitution provides:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

"This court interprets the search and seizure clause of the Illinois Constitution in 'limited lockstep' with its federal counterpart." *People v. LeFlore*, 2015 IL 116799, ¶ 16 (quoting *People v. Caballes*, 221 Ill. 2d 282, 314 (2006)).

¶ 20    The parties disagree whether the United States Supreme Court's recent decision in *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013) controls. The State argues that the officers conducted a dog sniff on the landing outside of defendant's apartment door and that the landing was not part of the defendant's curtilage under the "property-based" analysis announced in *Jardines*. Defendant counters that under *Jardines*, a search warrant is required to conduct a dog-sniff search at the entrance to a home.

¶ 21    In *Jardines*, the Miami-Dade police department received an "unverified tip" that marijuana was being grown in defendant's home. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1413. A month later, police went to defendant's home with a drug-detection dog. The dog approached the front porch and, after sniffing the base of the front door, gave a positive alert for narcotics. On the basis of the dog sniff, police applied for and received a warrant to search defendant's residence. A subsequent search of the residence resulted in discovery of marijuana plants. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1413.

¶ 22    The lead opinion, authored by Justice Scalia, limited its review "to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414. The Supreme Court held that a warrantless "dog sniff" of an individual's front porch was a search for purposes of the fourth amendment and suppressed the recovered evidence. The Supreme Court began its analysis by emphasizing that the fourth amendment establishes:

> "a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414 (quoting *United States v. Jones*, 565 U.S. ___, ___ n.3, 132 S. Ct. 945, 950 n.3 (2012)).

¶ 23    The Court in *Jardines* recognized that its decision in *Katz v. United States*, 389 U.S. 347 (1967), holding that property rights are not the sole measure of the fourth amendment's protections, may add to this baseline, but does not subtract anything from the fourth amendment's protections " 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.' " (Emphasis in original.) *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment, joined by Marshall, J.). The Supreme Court stated that the principle in such a case is straightforward:

> "The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414.

¶ 24    The Supreme Court in *Jardines* initially considered whether police intruded upon a constitutionally protected area. "The Fourth Amendment does not *** prevent all investigations conducted on private property ***." "But when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414 (quoting *Silverman v.*

*United States*, 365 U.S. 505, 511 (1961)). "[T]he area 'immediately surrounding and associated with the home'—what our cases call the curtilage" is regarded as " 'part of the home itself for Fourth Amendment purposes.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The Court found "no doubt" that the police officers entered the curtilage of Jardines's home as "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12).

¶ 25        After determining that police officers intruded upon a constitutionally protected area in *Jardines*, the Court turned to whether the police conduct in entering this constitutionally protected area with a drug-detection dog was "accomplished through an unlicensed physical intrusion." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415. The Court recognized that law enforcement officers need not " 'shield their eyes' when passing by the home 'on public thoroughfares,' " but an officer's ability to gather information is "sharply circumscribed" after stepping off the public thoroughfare. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Ciraolo*, 476 U.S. at 213). The Court also recognized an implicit license for individuals, including police, "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415.

¶ 26        "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). There is no customary invitation, however, for police to introduce "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1416.

¶ 27        The Court in *Jardines* noted that it was unnecessary to decide whether the officers' investigation violated Jardines's reasonable expectation of privacy under *Katz*. "The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." (Emphases in original.) *Jardines*,

569 U.S. at ___, 133 S. Ct. at 1417 (quoting *Jones*, 565 U.S. at ___, 132 S. Ct. at 951-52). Nor did it need to consider whether *Kyllo v. United States*, 533 U.S. 27 (2001), applied because "when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417. The Supreme Court concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417-18.

¶ 28        Justice Kagan, joined by Justices Ginsburg and Sotomayor, concurred in the majority opinion to express that the police conduct in *Jardines* violated the fourth amendment on privacy as well as property grounds. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1418 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.). Property concepts and privacy concepts will "align" in cases involving a search of a home as "[t]he law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1419 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (quoting *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)).

¶ 29        According to the concurring Justices, if this case had been decided on privacy grounds, then it would have been resolved by *Kyllo*. In *Kyllo*, the Court highlighted its "intention to draw both a 'firm' and a 'bright' line at 'the entrance to the house.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1419 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (quoting *Kyllo*, 533 U.S. at 40). In *Kyllo*, the Supreme Court announced the rule: " 'Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1419 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (quoting *Kyllo*, 533 U.S. at 40). The special concurrence concluded that police use of a drug-detection dog—a device not in general public use—to examine Jardines's home violated his expectation of privacy in his home. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1420 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.).

¶ 30        Justice Alito dissented, joined by Chief Justice Roberts and Justices Kennedy and Breyer. The dissent opined that the law of trespass provided no support for the

Court's holding and that there was no violation of the defendant's reasonable expectation of privacy under *Katz* because "[a] reasonable person understands that odors emanating from a house may be detected from locations that are open to the public." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1421 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). The dissent also disagreed with Justice Kagan's special concurrence, seeing "no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1424 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 31    The State attempts to distinguish this case from *Jardines* by arguing: (1) the landing in front of defendant's apartment does not qualify as curtilage under *Jardines*; (2) the landing does not qualify as curtilage under the four-factor test set forth in *United States v. Dunn*, 480 U.S. 294 (1987); (3) the borders of the curtilage should be straightforward and there is no easy way to determine where the boundaries are if common areas are considered curtilage; and (4) the common landing is not associated with the intimate activities of the home that animate the curtilage concept.

¶ 32    On the State's first argument—that the landing in front of defendant's apartment does not qualify as curtilage under *Jardines*—the State contends that the landing is different than the front porch at issue in *Jardines*. The State argues that the landing did not belong to defendant and she had no possessory interest in the landing. The State suggests that *Jardines* is applicable only to single-family residences and not applicable to leased apartments or condominiums because there is no legitimate expectation of privacy in common areas of such multiunit dwellings.

¶ 33    We are not persuaded by the State's argument. Here, the entrances to defendant's apartment building were locked every time police attempted to enter the secured building. Officers were only admitted to an area not accessible to the general public by a resident or by another officer. We emphasize that the "common areas" of the secured apartment building were clearly not open to the general public, a fact known by the officers who entered defendant's secured apartment building in the middle of the night.

¶ 34    We are equally unpersuaded by the State's second argument—that the landing does not qualify as curtilage under the four-factor test set forth in *Dunn*, 480 U.S. 294. In *Dunn*, the Supreme Court stated that the common-law concept of "curtilage" extended to the "area immediately surrounding a dwelling house" and the curtilage concept "plays a part, however, in interpreting the reach of the Fourth Amendment." *Dunn*, 480 U.S. at 300. *Dunn* recognized that "the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U.S. at 300 (citing *Oliver*, 466 U.S. at 180). *Dunn* further recognized that the central component of the curtilage inquiry is "whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life." ' " *Dunn*, 480 U.S. at 300 (quoting *Oliver*, 466 U.S. at 180, quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Supreme Court set forth a four-factor inquiry for analyzing curtilage questions: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301.

¶ 35    Considering the first *Dunn* factor, "the proximity of the area claimed to be curtilage to the home," the State does not dispute that the landing is located directly in front of defendant's apartment. We find that the proximity of the landing to defendant's apartment strongly supports an inference that the landing be treated as curtilage under the first *Dunn* factor.

¶ 36    The State contends that the last three *Dunn* factors weigh heavily against treating the landing as curtilage of defendant's apartment. Specifically, the State argues that the area was not included within an enclosure surrounded by the home that excluded others, there is no evidence that defendant put the landing to any use other than accessing her apartment, and that no effort was made by defendant to protect the area from observation. We disagree.

¶ 37    Here, the landing to defendant's apartment is an area located within a locked structure intended to exclude the general public. The third-floor landing is located directly outside of defendant's apartment door and the nature of its use is generally limited to defendant, the tenant of unit No. 9, and their invitees. The third-floor landing is an area with limited access, located within a locked building and not

observable by "people passing by." We find the last three *Dunn* factors weigh in favor of finding that the landing to defendant's apartment is curtilage and reject the State's argument to the contrary.

¶ 38 The State's third argument against a determination that the landing in front of defendant's apartment is curtilage is equally unavailing. The State argues that the boundaries of curtilage should be straightforward and there is no easy way to determine boundaries if common areas are considered curtilage. The State notes that the "boundaries of the curtilage are generally 'clearly marked,' [and] the 'conception defining the curtilage' is at any rate familiar enough that it is 'easily understood from our daily experience.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12).

¶ 39 As the State argues, "[t]his clarity is important for residents, who should know where they can expect privacy, and for officers, who need to make judgments, often quickly, in the field *** there is no easy way to determine where the boundaries would be if the common area were considered to be within the apartment's curtilage." The boundary to the landing of defendant's apartment is easily understood as curtilage. The landing is a clearly marked area within a locked building with limited use and restricted access, "familiar enough that it is 'easily understood from our daily experience.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12). We therefore reject the State's argument suggesting that the border of the landing to defendant's apartment is not straightforward and should not be considered curtilage.

¶ 40 We also disagree with the State's fourth argument that the landing in front of defendant's apartment "is not associated with the intimate activities of the home that animate the curtilage concept." The State's argument is simply a restatement of the concepts we have already addressed in the State's *Dunn* argument. The State quotes *People v. Pitman*, 211 Ill. 2d 502, 516 (2004), where this court stated: "[i]n determining whether a particular area falls within a home's curtilage, a court asks whether the area harbors the intimate activities commonly associated with the sanctity of a person's home and the privacies of life." In *Pitman*, this court noted: "[t]he extent of the curtilage is determined by factors 'that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.' " *Pitman*, 211 Ill. 2d at 516 (quoting *Dunn*, 480 U.S. at 300). This court then applied the *Dunn* four-factor test to the facts of that case. *Pitman*, 211 Ill. 2d at 516 (citing *Dunn*, 480 U.S. at 301). We have already examined the facts of

- 12 -

this case under the *Dunn* four-factor test and, therefore, reject the State's argument that the landing to defendant's apartment is not associated with the intimate activities of the home.

¶ 41 We reiterate that the entrances to defendant's apartment building were locked every time police attempted to enter the secured building and officers entered the building with the knowledge that the building they entered was not accessible to the general public. Thus, this case is distinguishable from situations that involve police conduct in common areas readily accessible to the public. Accordingly, we reject the State's argument that defendant's landing should not be treated as curtilage for purposes of the fourth amendment.

¶ 42 Even the *Jardines* dissent made observations that support our conclusion that the police conduct in this case violated the fourth amendment. The dissenting opinion in *Jardines* noted that custom grants "members of the public may lawfully proceed along a walkway leading to the front door of a house." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1421-22 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). The dissent specifically noted, however, that this license has certain spatial and temporal limits:

> "A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway. A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use. ***
>
> Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation. See *State* v. *Cada*, 129 Idaho 224, 233, 923 P. 2d 469, 478 (App. 1996) ('Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm')." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1422 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 43 Under the facts in *Jardines*, the dissent believed the officer did not exceed the scope of the license to approach Jardines's door. The officer "adhered to the customary path; he did not approach in the middle of the night; and he remained at the front door for only a very short period (less than a minute or two)." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1423 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). In contrast to *Jardines*, the police conduct in this case

certainly exceeded the scope of the license to approach defendant's apartment door when the officers entered a locked building in the middle of the night and they remained in the building for more than "a very short period of time," even taking time to have the drug-detection dog conduct an open-air sweep of other apartment doors in the building, for some unknown reason. See *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1423 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 44        We conclude that, under *Jardines*, 569 U.S. ___, 133 S. Ct. 1409, when police entered defendant's locked apartment building at 3:20 a.m. with a drug-detection dog, their investigation took place in a constitutionally protected area. We hold that the trial court properly determined that the warrantless use of the drug-detection dog at defendant's apartment door violated defendant's rights under the fourth amendment to the United States Constitution. U.S. Const., amend. IV.

¶ 45        The dissent would find there is no legitimate expectation of privacy in the odors that waft from an apartment to common areas of an apartment building. *Infra* ¶ 121. Our application of *Jardines*, however, makes it unnecessary to address the merits of whether use of the drug-detection dog violated defendant's reasonable expectation of privacy. See *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417.

¶ 46            II. Whether the Good-Faith Exception to the Exclusionary Rule Applies

¶ 47        The State asserts that even if this court determines the officers violated the fourth amendment in this case, the evidence should not be suppressed because the officers acted in good-faith reliance on established precedent. Generally, courts will not admit evidence obtained in violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). The fruit-of-the-poisonous-tree doctrine is an outgrowth of the exclusionary rule providing that "the fourth amendment violation is deemed the 'poisonous tree,' and any evidence obtained by exploiting that violation is subject to suppression as the 'fruit' of that poisonous tree." *People v. Henderson*, 2013 IL 114040, ¶ 33. "[T]he 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

- 14 -

¶ 48    The good-faith exception to the exclusionary rule has been codified in section 114-12(b)(1), (b)(2) of the Code of Criminal Procedure of 1963:

> "(1) If a defendant seeks to suppress evidence because of the conduct of a peace officer in obtaining the evidence, the State may urge that the peace officer's conduct was taken in a reasonable and objective good faith belief that the conduct was proper and that the evidence discovered should not be suppressed if otherwise admissible. The court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good faith.
>
> (2) 'Good faith' means whenever a peace officer obtains evidence:
>
> (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid; or
>
> (ii) pursuant to a warrantless search incident to an arrest for violation of a statute or local ordinance which is later declared unconstitutional or otherwise invalidated." 725 ILCS 5/114-12(b)(1), (b)(2) (West 2012).

¶ 49    The Supreme Court has expanded the good-faith exception to the exclusionary rule to include good-faith reliance upon binding appellate precedent that specifically authorized a particular practice but was subsequently overruled. *Davis v. United States*, 564 U.S. 229, ___, 131 S. Ct. 2419, 2429 (2011). The *Davis* expansion of the good-faith exception to the exclusionary rule was recently adopted by this court in *LeFlore*, 2015 IL 116799, ¶¶ 29-31.

¶ 50    Here, the appellate court rejected the State's argument that the evidence should not be suppressed because the officers acted in good-faith reliance on established precedent. The appellate court held that no binding precedent specifically authorized the officers' conduct (see *Davis*, 564 U.S. at ___, 131 S. Ct. at 2429), and the exception to the exclusionary rule announced in *Davis* is not applicable to this case. 2015 IL App (4th) 140006, ¶ 60. At the time the appellate court issued its decision in January 2015, it did not have the benefit of our recent decision in *LeFlore*, 2015 IL 116799.

¶ 51    In *LeFlore*, this court began its analysis by recognizing that "[t]he mere fact of a fourth amendment violation does not mean that exclusion necessarily follows" because there "is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed at trial." *LeFlore*, 2015 IL 116799, ¶ 22. Rather, the exclusionary rule has been applied only to "unusual cases" when its application will deter future fourth amendment violations. *LeFlore*, 2015 IL 116799, ¶ 22. Exclusion of evidence is a court's last resort, not its first impulse. *LeFlore*, 2015 IL 116799, ¶ 22. Importantly, this court noted in *LeFlore*:

> "In order for exclusion of the evidence to apply, the deterrent benefit of suppression must outweigh the 'substantial social costs.' [*United States v.* ]*Leon*, 468 U.S. [897,] 907 [(1984)]. ' "Exclusion exacts a heavy toll on both the judicial system and society at large," because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." ' [*United States v.* ]*Stephens*, 764 F.3d [327,] 335 [(4th Cir. 2014)] (quoting *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427). 'As this result conflicts with the "truth-finding functions of judge and jury," [citation] exclusion is a "bitter pill," [citation] swallowed only as a "last resort," [citation].' [Citation.] In order for the exclusionary rule to be appropriate then, the deterrent benefits must outweigh its heavy costs. *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427." *LeFlore*, 2015 IL 116799, ¶ 23.

¶ 52    We recognized in *LeFlore* that when there is no illicit conduct to deter, the deterrent rationale loses much of its force and, thus, "exclusion is invoked only where police conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the cost of suppression. [Citations.]" *LeFlore*, 2015 IL 116799, ¶ 24. We emphasized that in determining whether the good-faith exception to the exclusionary rule applies in any case, the inquiry is " 'whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.' [Citation.]" *LeFlore*, 2015 IL 116799, ¶ 25.

¶ 53    The State argues that the good-faith exception to the exclusionary rule should apply for three reasons: (1) the officers relied on binding United States Supreme Court precedent holding that dog sniffs are not fourth amendment searches; (2) the officers relied on Illinois precedent holding that residents have no reasonable

expectations of privacy in apartment building common areas; and (3) the officers relied on federal precedent holding that dog sniffs outside residence doors were not fourth amendment searches. According to the State, it was objectively reasonable for the officers to rely in good faith on the legal landscape that existed at the time of the dog sniff. Additionally, the State argues that the officers seized the evidence in good-faith reliance on the search warrant.

¶ 54    The State cites *United States v. Place*, 462 U.S. 696 (1983), *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Illinois v. Caballes*, 543 U.S. 405 (2005), in arguing that officers relied on binding United States Supreme Court precedent holding that dog sniffs are not fourth amendment searches. In *Place*, the Supreme Court held that use of a drug-detection dog to sniff luggage at an airport "did not constitute a 'search' within the meaning of the Fourth Amendment." *Place*, 462 U.S. at 707. In *City of Indianapolis*, the Supreme Court held that there was no fourth amendment search when officers conducted a dog sniff of an automobile at a highway checkpoint. *City of Indianapolis*, 531 U.S. at 40. In *Caballes*, the Supreme Court held that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [citation]—during a lawful traffic stop generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707).

¶ 55    The appellate court determined that the United States Supreme Court precedent did not specifically authorize the conduct of the officers in this case because those cases did not involve use of drug-detection dogs to sniff a home. 2015 IL App (4th) 140006, ¶ 57. The appellate court recognized that use of a drug-detection dog to sniff a home in the hopes of discovering incriminating evidence presents a very different issue than use of drug-detection dogs on automobiles during a lawful traffic stop and in public areas. 2015 IL App (4th) 140006, ¶ 57. We agree with the appellate court that the United States Supreme Court precedent concerning use of drug-detection dogs to sniff areas other than a home did not specifically authorize the officers' conduct in this case.

¶ 56    Indeed, contrary to the State's argument, United States Supreme Court precedent has long provided that the home has heightened expectations of privacy and that at the core of the fourth amendment is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman*, 365 U.S. at 511. The Supreme Court has stressed " 'the overriding

respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' " *Oliver*, 466 U.S. at 178 (quoting *Payton v. New York*, 445 U.S. 573, 601 (1980)). The curtilage, being the area "immediately surrounding and associated with the home" is also regarded as "part of home itself for Fourth Amendment purposes." *Oliver*, 466 U.S. at 180. Here, the police conduct involving the warrantless use of a drug-detection dog at 3:20 a.m. at defendant's apartment door, located within a locked apartment building, is simply not supported by an objectively reasonable good-faith belief that their conduct was specifically authorized under any United States Supreme Court precedent.

¶ 57     The State next argues that the good-faith exception to the exclusionary rule should apply because the officers relied on binding Illinois precedent holding that residents had no reasonable expectations of privacy in apartment building common areas. The State relies on *People v. Smith*, 152 Ill. 2d 229 (1992), and *People v. Lyles*, 332 Ill. App. 3d 1 (2002), to assert that Illinois precedent established that tenants in an apartment building have no reasonable expectation of privacy in common areas.

¶ 58     In *Smith*, police officers went to the defendant's apartment building, opened the building's unlocked rear door, and walked to a common-area hallway. While standing in the hallway, the officers overheard a conversation relating to a murder they were investigating. This court held that the officers' conduct did not constitute a search under the fourth amendment. *Smith*, 152 Ill. 2d at 245-46. Contrary to the State's assertion, *Smith* did not hold that tenants have no expectation of privacy in common areas of locked apartment buildings. Rather, *Smith* concerned an individual's reasonable expectation of privacy in things overheard by the police while standing in a common area of an unlocked apartment building. Consequently, *Smith* does not support the State's position.

¶ 59     In *Lyles*, police officers arrested three suspects emerging from the back of an apartment building that had a locked outer door. While arresting the suspects, the officers held open the outer door and subsequently ascended the staircase, where they found two guns in a garbage can on the defendant's back porch. The appellate court in *Lyles* held that a tenant "has no reasonable expectation of privacy in common areas of an apartment building that are accessible to other tenants and their invitees." *Lyles*, 332 Ill. App. 3d at 7. Here, the appellate court determined that *Lyles*, an Appellate Court, First District decision, did not involve the use of a

- 18 -

drug-detection dog and was not binding on the Appellate Court, Fourth District. 2015 IL App (4th) 140006, ¶ 58.

¶ 60    Instead, the appellate court determined that its own decision in *Trull*, 64 Ill. App. 3d 385, was binding appellate court precedent relating to the officer's conduct. 2015 IL App (4th) 140006, ¶ 59. In *Trull*, the officers used keys found at the site of a burglary to open the outer door to defendant's apartment building. In determining that the entry into a locked common area of an apartment building in *Trull* violated the fourth amendment, the appellate court stated:

> "A person's legitimate expectations of privacy are to be protected. (*Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507.) Federal cases have indicated that the common areas of a locked apartment building are protected under the fourth amendment. (*United States v. Carriger* (6th Cir. 1976), 541 F.2d 545; *United States v. Fluker* (9th Cir. 1976), 543 F.2d 709; *United States v. Case* (7th Cir. 1970), 435 F.2d 766; *United States v. Blank* (N.D. Ohio 1966), 251 F. Supp. 166.) *** We discern a marked difference between an individual's expectation of privacy in a locked apartment building as compared to an unlocked one. It seems rather elementary to us that a locked door is a very strong manifestation of a person's expectation of privacy. Thus, we conclude that the common entries and hallways of a locked apartment building are protected by the fourth amendment." *Trull*, 64 Ill. App. 3d at 389.

The appellate court determined that the conduct of the officers in entering the defendant's locked apartment building with a drug-detection dog was not authorized under *Trull*. 2015 IL App (4th) 140006, ¶ 59.

¶ 61    The State contends that under *Smith* and *Lyles*, *Trull* was no longer good law. The State further argues that the officers could reasonably rely on *Smith* and *Lyles* to conduct their dog sniff because defendant had no reasonable expectation of privacy in the common landing outside her apartment door under *Smith* and *Lyles*. We reject the State's argument. As explained earlier in this opinion, *Smith* did not hold that tenants have *no* expectation of privacy in common areas of locked apartment buildings; rather, *Smith* concerned an individual's reasonable expectation of privacy in things overheard by the police while standing in a common area of an unlocked apartment building. *Supra* ¶ 58.

¶ 62    Moreover, at the time of the officers' conduct in this case, *Trull* stood, and still stands, as binding Appellate Court, Fourth District precedent extending the

protection of the fourth amendment to the common areas of a locked apartment building. We agree with the appellate court's conclusion that there was no binding Illinois precedent specifically authorizing the officers' conduct in this case. More critically, *Trull* constitutes binding Appellate Court, Fourth District precedent finding similar police conduct unconstitutional.

¶ 63    Likewise, the State's argument that *Trull* was no longer good law under *Lyles* is not accurate. Both *Trull* and *Lyles* relied on federal precedent. *Trull*, an Appellate Court, Fourth District case relied on federal cases holding that common areas of a locked apartment building are protected under the fourth amendment. See *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976); *United States v. Fluker*, 543 F.2d 709 (9th Cir. 1976); *United States v. Case*, 435 F.2d 766 (7th Cir. 1970); *United States v. Blank*, 251 F. Supp. 166 (N.D. Ohio 1966).

¶ 64    *Lyles*, an Appellate Court, First District case, noted that *Trull* relied on *Case*, 435 F.2d 766, among other federal cases, and that *Case* was subsequently overruled in *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991). *Lyles* relied on federal cases holding that a tenant had no reasonable expectation of privacy in the common areas of apartment buildings, even if the door to the apartment building is locked. See *United States v. Barrios-Moriera*, 872 F.2d 12, 14-15 (2d Cir. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993); see also *United States v. Miravalles*, 280 F.3d 1328, 1329, 1333 (11th Cir. 2002) (no reasonable expectation of privacy where the lock on the front door of the apartment building was not working on the day police entered the building).

¶ 65    *Lyles* did not hold that *Trull* was no longer good law. Rather, *Lyles* simply recognized that one of the federal cases relied on in *Trull* was subsequently overruled, and that there were cases from other federal circuits holding that tenants have no reasonable expectation of privacy in the common areas of a locked apartment building. *Lyles* merely showed a split in authority in the federal courts, and created a conflict between the First and Fourth Districts of the Illinois Appellate Court.

¶ 66    Here, the appellate court properly determined that *Trull*, an Appellate Court, Fourth District case, was binding authority in this case, and that the Appellate Court, First District case of *Lyles* was distinguishable and not binding in the Fourth

District. See *People v. Collings*, 95 Ill. App. 3d 325 (1981) (rulings of the appellate court of any district are binding precedent on all circuit courts if there are no contrary rulings of another district on the same issue but rulings are not binding precedent upon the other districts of the appellate court). We therefore reject the State's argument that the good-faith exception to the exclusionary rule should apply because the officers could reasonably rely on *Smith* and *Lyles*.

¶ 67    The State also cites federal cases holding that officers acted in good faith when they conducted pre-*Jardines* dog sniffs outside homes. *United States v. Gutierrez*, 760 F.3d 750 (7th Cir. 2014); *United States v. Davis*, 760 F.3d 901 (8th Cir. 2014); *United States v. Winters*, 782 F.3d 289 (6th Cir. 2015); *United States v. Givens*, 763 F.3d 987 (8th Cir. 2014); *United States v. Hunter*, 770 F.3d 740 (8th Cir. 2014); *Jones v. United States*, 14 F. Supp. 3d 811 (W.D. Tex. 2014); *United States v. Parrilla*, No. 13 Cr. 360(AJN), 2014 WL 2111680 (S.D.N.Y. May 13, 2014). The State urges this court to join those other jurisdictions in finding that the officers did not act culpably by conducting the pre-*Jardines* dog sniff. Significantly, as even the State acknowledges in its brief, these cases relied on binding precedent of their own jurisdictions in applying the good-faith exception to officer conduct that occurred prior to the United States Supreme Court decision in *Jardines*. Nevertheless, the State argues that even if there were no binding precedent specifically authorizing the officers' conduct, the officers could have relied on the "legal landscape" to perform a dog sniff in an apartment building common area. Again, the State focuses on nonbinding precedent of other jurisdictions. The State's reliance on those cases is irrelevant to our inquiry of whether the officers in this case acted in good faith based on binding precedent when existing Illinois Appellate Court, Fourth District authority (*Trull*) was applicable.

¶ 68    Not only was there no binding precedent specifically authorizing the officers' conduct in this case, *Trull* constitutes binding Appellate Court, Fourth District authority specifically prohibiting the conduct. We therefore hold that the good-faith exception to the exclusionary rule announced in *Davis*, 564 U.S. at ___, 131 S. Ct. at 2429, and adopted in *LeFlore*, 2015 IL 116799, does not apply to the officers' warrantless use of a drug-detection dog at defendant's apartment door, located within a locked apartment building.

¶ 69    The State also argues that the officers seized the evidence in good-faith reliance on the search warrant. Generally, evidence will not be excluded when officers reasonably relied on a search warrant issued by a neutral magistrate, even when the

warrant application was later determined to be insufficient to establish probable cause. *Leon*, 468 U.S. at 913, 922. The State acknowledges that the officers' reliance on the warrant must be reasonable. Given " 'the purpose of the exclusionary rule is to deter unlawful police conduct, *** evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Leon*, 468 U.S. at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). At the time of the officers' conduct in this case, *Trull*, holding that common areas of locked apartment buildings are protected by the fourth amendment, was binding Appellate Court, Fourth District precedent. *Trull*, 64 Ill. App. 3d at 387. The officers are, therefore, charged with the knowledge that the search violated the fourth amendment under *Trull*. We find that the officers' reliance on the warrant issued on the basis of information obtained in violation of *Trull* was unreasonable.

¶ 70    The only cases the State relies on for this point are from other jurisdictions. The State cites *State v. Scull*, 862 N.W.2d 562, 565-66 (Wis. 2015), where officers performed a pre-*Jardines* dog sniff in front of Scull's house, then obtained a search warrant based on the dog's positive alert. The Wisconsin Supreme Court held that the good-faith exception to the exclusionary rule applied to evidence seized in the subsequent search of Scull's home because "the officers ultimately obtained a warrant to search Scull's home and that warrant was issued by a detached and neutral commissioner," whose "decision to grant the warrant was a reasonable application of the unsettled state of the law at the time the warrant issued." *Scull*, 862 N.W.2d at 568.

¶ 71    *Scull* is not controlling and is distinguishable from this case. In contrast to the "unsettled" state of the law in Wisconsin, at the time of the officers' conduct in this case, *Trull*, holding that common areas of locked apartment buildings are protected by the fourth amendment, was binding Appellate Court, Fourth District precedent in Illinois. *Trull*, 64 Ill. App. 3d at 387.

¶ 72    The State also cites *United States v. Ponce*, 734 F.3d 1225, 1228-29 (10th Cir. 2013), where the court similarly applied the good-faith exception to a pre-*Jardines* warrant obtained using a dog sniff outside a garage because the officer reasonably could have believed that the dog sniff was not a fourth amendment search and that the area was not within the curtilage of the house, and thus could reasonably rely on the warrant. We find *Ponce* distinguishable from the facts of this case. *Ponce*

involved a dog sniff outside a garage, not a dog sniff of a landing in a locked apartment building.

¶ 73    For these reasons, we hold that the good-faith exception to the exclusionary rule is not applicable.

¶ 74           III. Whether the Remaining Evidence Established Probable Cause for Issuance
                                    of the Search Warrant

¶ 75    The State argues that even if the officers' use of the drug-detection dog in this case violated the fourth amendment and the good-faith exception to the exclusionary rule does not apply, the remaining evidence in the warrant application established probable cause to search defendant's apartment. "[I]f the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *People v. Free*, 94 Ill. 2d 378, 399 (1983). The "existence of probable cause in a particular case means simply that the totality of the facts and circumstances *** was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." (Internal quotation marks omitted.) *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). The "probable cause requirement is rooted in principles of common sense" and a court asks "whether, given all the circumstances set forth in the affidavit *** there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *McCarty*, 223 Ill. 2d at 153.

¶ 76    The trial court determined that if the paragraphs regarding the dog sniff were excised from the affidavit for a search warrant, the remaining facts pleaded were insufficient to establish probable cause for the issuance of a search warrant. Aside from the dog sniff evidence, the application included an uncorroborated Crimestoppers tip that defendant was receiving shipments of marijuana from her brother in California, whose name was unknown; she had recently received a two-pound package of marijuana on November 21, 2012; that she was selling two pounds of marijuana per week; and that defendant had sold ecstasy to the tipster's girlfriend.

¶ 77    In considering an informant's tip, the court must consider the detail of the tip, whether the tip established the basis of the informant's knowledge, whether the informant witnessed criminal behavior, and whether the tip accurately predicts future activity of the suspect. See *People v. Kline*, 355 Ill. App. 3d 770 (2005). Here, the anonymous tipster did not indicate how knowledge of defendant's alleged criminal activity was gained, nor did the tipster claim to have witnessed defendant's criminal behavior or provide an address where defendant was allegedly receiving and selling contraband. The tipster did not provide a name of the person allegedly sending defendant the contraband. An uncorroborated anonymous tip alone is insufficient to establish probable cause. See *People v. Ledesma*, 206 Ill. 2d 571, 587 (2003), *overruled on other grounds in People v. Pitman*, 211 Ill. 2d 502 (2004).

¶ 78    The State also relies on the package from California addressed to defendant seen by Detective Mecum in the apartment building. However, the record does not indicate when Detective Mecum observed the package, where in the building the package was observed, or the dimensions of the package to indicate whether it could reasonably be tied to drug sales.

¶ 79    We agree with the trial court and the appellate court that the application for search warrant in this case, absent the dog sniff, was insufficient to establish probable cause for a search warrant of defendant's home. As the appellate court aptly noted:

> "Absent the dog sniff, the evidence relied upon in the complaint and affidavit for a search warrant is scanty at best. We cannot determine from the record the specific time on January 10 when [Detective] Mecum observed a package addressed to defendant with a return address shipping label from an individual in California. [Defendant's personal social media] showing images favoring the legalization of marijuana and images of marijuana and currency coupled with defendant's prior police contacts for possession are not sufficient to establish probable cause for a search warrant of defendant's home." 2015 IL App (4th) 140006, ¶ 64.

We likewise find that the remaining evidence in the complaint and affidavit for a search warrant in this case was insufficient to support probable cause for issuance of a search warrant.

CONCLUSION

¶ 81    We hold that the warrantless use of a drug-detection dog at 3:20 a.m. at defendant's apartment door, located within a locked apartment building, violated defendant's rights under the fourth amendment to the United States Constitution. U.S. Const., amend. IV. We conclude that the good-faith exception to the exclusionary rule does not apply. We further determine that, absent the dog sniff, the evidence relied upon in the complaint and affidavit for search warrant was insufficient to establish probable cause for a search warrant of defendant's home. We affirm the judgment of the appellate court and affirm the trial court's judgment granting defendant's motion to suppress.

¶ 82    Affirmed.

¶ 83    CHIEF JUSTICE GARMAN, specially concurring:

¶ 84    I agree with the majority's conclusion that the dog sniff at issue here violated the fourth amendment as contemplated in *Florida v. Jardines*. I likewise take no issue with its analysis on the good-faith exception to the exclusionary rule and its analysis on the other information contained within the warrant application. However, I would focus on the central location of the fourth amendment interest to address the *Jardines* question. This analysis produces uniform results for multiunit dwellings and recognizes the degree to which residents share spaces in a multiunit dwelling.

¶ 85    The State notes *Jardines* depended on fourth amendment property-rights analysis and that the concurrence finding a violation of a "reasonable expectation of privacy" under *Katz v. United States* did not carry the day. See generally *Florida v. Jardines*, 569 U.S. ___, ___, 133 S. Ct. 1409, 1418-20 (2013) (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.). Thus, the State contends *Jardines* applies only under a property-rights analysis framework. I have concerns about this conclusion. While the United States Supreme Court's majority opinion confined its analysis to trespass on a constitutionally protected area, it did so through a finding that the porch was curtilage. The curtilage, unlike the open fields, is protected by the fourth amendment. *United States v. Dunn*, 480 U.S. 294, 300 (1987). Whether an area is protected as curtilage depends on "factors that bear upon

whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The Supreme Court has specifically "defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver*, 466 U.S. at 180. Where the curtilage is distinguished from unprotected open fields by "reference to the factors that determine whether an individual reasonably may expect" that area "will remain private," the curtilage finding may inherently incorporate a reasonable expectation of privacy. *Id.*

¶ 86    Even if *Jardines* stands only for a property-based analysis, the landing immediately outside defendant's front door may yet qualify as curtilage.[1] Notably, the curtilage need not be "the home itself"; instead, the question is whether it qualifies to be "*treated as* the home itself." (Emphasis added.) *Dunn*, 480 U.S. at 300. The "central component" of the question is "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.' " (Internal quotation marks omitted.) *Id.* (quoting *Oliver*, 466 U.S. at 180). To answer this question, the Supreme Court has stated a four-factor test: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. The Court specifically has cautioned against a mechanistic application of these factors. "We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

---

[1]There is no *per se* rule that apartments do not have curtilage for fourth amendment purposes. In *People v. McNeal*, this court assumed, without deciding, that a garbage can containing the defendant's gun was located in the curtilage to his residence, which was described as an "apartment" and a "townhouse." 175 Ill. 2d 335, 342, 343 (1997). *People v. Vaglica* found that the back porch of an apartment, accessible from a backyard, was curtilage. 99 Ill. App. 2d 194, 197 (1968) ("Traditionally, courts have held that the curtilage, whether fenced or open, is an area protected from unreasonable searches. The porch in question, being within the curtilage, will therefore be considered as within the zone of protection.").

¶ 87    The majority opinion addresses, as two separate questions, whether defendant's landing and door qualified as curtilage under *Jardines* and whether defendant's landing and door qualified as curtilage under the four-part *Dunn* test. The Supreme Court has stated that "curtilage questions should be resolved with particular reference to four factors" as enumerated in *Dunn* (*id.*), yet in *Jardines* it did not apply those factors or even cite *Dunn*. However, it does not appear this constitutes an abandonment or abrogation of the *Dunn* four-factor test. The Supreme Court appears to have found Jardines's front porch to be such a textbook example of curtilage that it found no need to assess each of the four factors. "Here there is no doubt that the officers entered [the curtilage]: The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12). By all appearances, then, *Dunn* remains the dominant curtilage test, and I would apply its factors in a manner consistent with the facts in *Jardines*, rather than trying to address the two questions separately. I would also closely examine the fourth amendment interest protected in *Jardines*.

¶ 88    Cases assessing whether to consider an area protected curtilage fall into two general classes, revealing that curtilage actually serves two distinct fourth amendment purposes. The first class of cases examines whether an area outside the home should be granted equivalent protection to the home, for activities and possessions within that area. In effect, the curtilage in these cases enlarges the home. The second class of cases is less concerned with the space for life activities and instead examines the degree to which surveillance by law enforcement intrudes upon the life activities *within* the home. Such cases are more concerned with the vantage point of police. The curtilage in these cases shields the core fourth amendment area of the home itself.[2]

¶ 89    In *Dunn*, the defendant was convicted of conspiring to manufacture phenylacetone and amphetamine based on what drug enforcement agents observed

---

[2]These two distinct purposes also happen to line up with the two primary definitions of the transitive verb "to harbor," which the Supreme Court and this court have employed in describing how "the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at 301 n.4; Merriam-Webster's Collegiate Dictionary 529 (10th ed. 1998) ("1 a : to give shelter or refuge to b : to be the home or habitat of"); see also *People v. Pitman*, 211 Ill. 2d 502, 516 (2004); *People v. Nielson*, 187 Ill. 2d 271, 281 (1999).

within his barn. *Dunn*, 480 U.S. at 296-98. Agents sought a search warrant after observing what appeared to be a phenylacetone laboratory within the barn, by peering over its doors. The Supreme Court considered the four factors in turn. Noting that the barn was 50 yards from the fence surrounding the house, and 60 yards from the house itself, the Court found the first factor cut against a finding of curtilage. *Id.* at 302. Next, the Court noted that the barn was located outside the fence surrounding the house and concluded "it is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Id.*

¶ 90　　As to the third factor, the Court found it "*especially significant* that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." (Emphasis added.) *Id.* The Court then described signs of various activities of phenylacetone production in the barn, noting that "the above facts indicated to the officers that the use to which the barn was being put could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the barn as part of respondent's home." *Id.* at 303. Finally, the Court noted the defendant had done little to protect the barn area from observation by those standing in the open fields; various interior fences on the farm property served no function "other than that of the typical ranch fence," to corral livestock and not to prevent human observation. *Id.*

¶ 91　　The incriminating activities and search in *Dunn* occurred outside the physical structure of the home itself. Whether the barn was curtilage was, fundamentally, a question of whether Dunn could carry out activities and store possessions there "under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301. *Dunn* fits within the home-extending curtilage cases. See also *Oliver*, 466 U.S. at 179 (noting that curtilage, in contrast to the open fields, extends "the setting for those intimate activities"). This court has reached the same result under very similar circumstances in assessing whether a building outside the home qualifies as curtilage. See, *e.g.*, *Pitman*, 211 Ill. 2d at 518.

¶ 92　　On the other hand, the curtilage may also act as a buffer to shield the core fourth amendment area within the home, and these cases typically focus on where law enforcement officers stand in making their observations. This court has recognized that, where an officer uses his own natural senses from a permitted vantage point on public property to discover what is occurring inside a private residence, it is not a

search in violation of the fourth amendment. *People v. Wright*, 41 Ill. 2d 170, 175 (1968). This court noted "the absence of a trespass under our reading of *Harris* is of major if not decisive importance in cases involving the plain-view doctrine." *Id.* at 176. The question of trespass in the curtilage is, as a general matter, resolved by inquiry into the license afforded the general public to approach. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415-16 ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' *Kentucky* v. *King*, 563 U. S. ___, ___[, 131 S. Ct. 1849, 1862] (2011) ***.").

¶ 93    "On the other hand, if the police stray from that path to other parts of the curtilage in order to conduct the surveillance, then the use of natural sight or hearing or smell to detect what is inside is a search within the meaning of the Fourth Amendment." 1 Wayne R. LaFave, Search and Seizure § 2.3(c), at 756-57 (5th ed. 2012). The focus thus becomes not the outside area observed and the activities to which it has been put, but rather where police stand in observing defendants' activities within the home itself. See, *e.g.*, *Hardesty v. Hamburg Township*, 461 F.3d 646, 652-53 (6th Cir. 2006) (finding that home's back deck, from which officers peered through window to observe a bloodied and unresponsive young man, was part of the home's curtilage); *People v. Greene*, 289 Ill. App. 3d 796, 799-800 (1997) (describing officers' entry onto a screened porch to observe defendant through the window and concluding the porch qualified as curtilage). In such cases, the curtilage question does not govern an extended area for activities; it determines whether the area acts as curtilage to shield the interior of the home. The protection claimed by defendant in this case fits neatly within the home-shielding curtilage cases. There is no claim defendant's activities or possessions were outside the home but within an area that should be protected as though it were the home. Instead, defendant's motion to suppress relies on the vantage point employed by police to observe what was taking place *within* her apartment.

¶ 94    Somewhat complicating our analysis of this question is the *Jardines* Court's brevity in holding that front porch to be curtilage. "The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S.

at 182 n.12 (finding that field of marijuana a mile from petitioner's home was unprotected "open fields" and not curtilage)). Consideration of the *Dunn* factors, however, yields important similarities between the protection found in *Jardines* and the protection claimed here. The front porch is, naturally, extremely close to the house. There was no discussion in *Jardines* about any enclosure surrounding the porch or the home. We can reasonably conclude the Court intended its curtilage finding to apply to enclosed and unenclosed porches alike. The front door obviously acts a passage into the house, and there is no further discussion of home activities taking place there.

¶ 95    However, whether we presume the porch was enclosed or unenclosed, Jardines could not have engaged in his cultivation of cannabis on the porch with any expectation it would be "placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. *Jardines* does not turn on protecting a zone outside the house for activities and possessions. Instead, the relevant question in *Jardines* was the vantage point of the officers on the curtilage and their actions in observing Jardines's activities within the home. The porch's extreme proximity to the house and its status as a primary entrance to the house are thus particularly important. Viewed in this light, *Jardines* must be understood as a case in which the curtilage acts as a shield. While the porch was deemed to be a "constitutionally protected area," the property-based fourth amendment interest to be vindicated was centered *within* the home. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415. "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Id.* at ___, 133 S. Ct. at 1414.

¶ 96    Both proximity and acting as an entry to the home are equally present in defendant's case. In every relevant sense, defendant's front door and landing appear indistinct from Jardines's front door and porch. Were this court to hold that an apartment uniformly lacks fourth amendment curtilage, we would additionally hold that those who live in apartments have less property-based fourth amendment protection *within* their homes than those who live in detached housing. This conclusion would, likewise, apply to those who live in duplexes, condominiums, and all other forms of multiunit housing.

¶ 97    I would conclude that, where officers carry out a canine sniff of the door to an apartment or other dwelling unit over which the defendant has exclusive control, a

search is being carried out, and the fourth amendment applies. The fact that defendant lived within a locked apartment building is helpful to her argument that her front door and landing were curtilage, but not dispositive. The State notes that another resident may grant police entry to the common areas of the apartment building, but nothing indicates defendant's fellow residents may give the police license to carry out a dog sniff of the door. Further, there is no indication the front door and porch in *Jardines* were anything other than physically open to the world. Recognizing that the fourth amendment interest here centers within the home likewise produces a uniform result for multiunit dwellings irrespective of whether the unit's door is within a locked building, within an unlocked building, or opens directly onto outdoor private property. In such cases, the front door and area immediately surrounding it must be viewed as "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection," due to its extreme proximity to that core fourth amendment area and its entry into that area. *Dunn*, 480 U.S. at 301.

¶ 98      Recognizing that the curtilage question in this case protects the core fourth amendment area within the home does not, on the other hand, lead to a result that every police entry into a common area of an apartment building will be a search. To the extent a defendant might claim curtilage as an extended area for the activities of the home, courts must recognize the individual facts and circumstances indicating defendant shares that area with others. See, *e.g.*, *People v. Smith*, 152 Ill. 2d 229, 245 (1992) (finding no search occurred because "the area where the officers overheard defendant's conversation was a common area shared by other tenants, the landlord, their social guests and other invitees"; area was unlocked; defendant's voice was raised; and officers employed only their natural senses). Such shared control directly impacts the license that may be granted to the police or public.

¶ 99      Police here exceeded any license offered to the public or that might have been offered by one of defendant's fellow tenants. Defendant herself neither granted nor implied any license to approach with a drug-detecting dog. Her front door and landing are, in all relevant respects, identical to the front door and porch in *Jardines*. The fourth amendment interest to be vindicated here centers within her apartment, and she employs the curtilage concept only as a shield for that core area. These reasons all militate in favor of a finding that, under *Jardines*, police carried out a search in violation of the fourth amendment with a warrantless dog sniff of her apartment door.

¶ 100    This approach yields a uniform result within the homes of multiunit residents and likewise recognizes the degree to which they share space for activities and possessions outside the home.

¶ 101    For the foregoing reasons, I specially concur.

¶ 102    JUSTICE THOMAS, dissenting:

¶ 103    I disagree with the majority's holding that the common area of the hallway landing outside of defendant's apartment constituted curtilage under the property-based trespass analysis of *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013). The better view is that the concept of curtilage has no application to the common areas of multiple-unit structures. See 1 Wayne R. LaFave, Search and Seizure § 2.2(g), at 50; § 2.3(c), at 55 (5th ed. Supp. 2015). I would also reject defendant's alternative argument that she had a reasonable expectation of privacy in the common area of the apartment building. The great weight of federal authority holds that there is no reasonable expectation of privacy in the common areas of an apartment building, even if it is locked or secured. See, *e.g.*, *United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993) (holding that defendant has no reasonable expectation of privacy in common area of a secured apartment building); *United States v. Holland*, 755 F.2d 253 (2d Cir. 1985) (same); *United States v. Eisler*, 567 F.2d 814 (8th Cir. 1977) (same).

¶ 104    I. Facts

¶ 105    Urbana police department's Crimestoppers hotline received a tip that defendant was selling two pounds of marijuana per week, had received shipments of marijuana from her brother in California, and had sold ecstasy to the tipster's girlfriend. Officer Matthew Mecum went to defendant's apartment building on January 10, 2013, to confirm defendant's address. The three-story, twelve-unit building had two sides with two outer doors that led to two common area stairwells that accessed six apartments per side, two per story. Defendant lived on the east side of the building.

¶ 106    Officer Mecum knocked on the outer door to defendant's side of the building and a resident let him in. At the time, Mecum was wearing blue jeans and a winter

jacket, and he did not display any indicia to show that he was a police officer. Mecum observed a package addressed to defendant at apartment No. 10 from "Ben Jones in Oakland, California."

¶ 107    Later that night, Officer Michael Cervantes took a trained narcotics-detection dog named Hunter to defendant's apartment building. The common entrance that accessed the east stairwell leading to defendant's apartment was locked, but another officer who was already inside opened the door for Cervantes. Once inside the outer common door, there was nothing obstructing the path to the third-floor landing.

¶ 108    Hunter alerted to the presence of drugs outside of defendant's apartment door in the common area of the third-floor landing. Located on that landing were the doors for defendant's apartment (unit No. 10), another apartment (unit No. 9) and a storage compartment. Hunter was allowed to sniff in the common area near unit No. 9 and in the common area near the two first-floor apartments. He did not alert to the aroma of drugs at any of those other locations.[3]

¶ 109    Officer Mecum prepared a complaint and affidavit for a search warrant that included the Crimestoppers information, defendant's past history with cannabis, the information on her Facebook page, and the fact that Mecum had observed the package addressed to defendant from California. A judge authorized the warrant. During a subsequent search of defendant's apartment, the police seized 1011.99 grams of cannabis, assorted drug paraphernalia and United States currency.

¶ 110                              II. No Trespass of the Curtilage Occurred

¶ 111    Justice Kilbride, writing for a majority of this court, holds that the common area of the landing outside of defendant's apartment door qualifies as curtilage under *Jardines*. Justice Kilbride concludes that this is so for several reasons. First, he finds that the outside common door to the building had a locking mechanism and the common stairwell behind it was therefore an area of "limited access" that was "not accessible to the general public." *Supra* ¶¶ 33, 37. And second, he finds it significant that the officers entered "in the middle of the night." *Supra* ¶ 33.

---

[3]The dog did not search inside any of the apartments; he sniffed the air outside of them while being walked through the common hallway.

¶ 112    Both points relied upon by the majority—the locked common door and the nighttime nature of the visit—are irrelevant to any discussion of the issue presented in this case as to the scope of the curtilage. The crucial facts in *Jardines* were that "[t]he officers were gathering information in an area *belonging* to Jardines and immediately surrounding his house—in the curtilage of the house, which [the Court has] held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." (Emphasis added.) *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414.

¶ 113    Here, in contrast to *Jardines*, the defendant as lessee of apartment No. 10 had no right to explicitly or implicitly exclude the officers from physically entering or occupying the area of the third-floor landing. "[T]he concept of curtilage has little if any application to commercial structures or to multiple-unit [apartment] dwellings," and therefore a dog sniff in the common areas of such structures "would likely be deemed a non-search" by the United States Supreme Court. 1 Wayne R. LaFave, Search and Seizure § 2.2(g), at 50 (5th ed. Supp. 2015). See also *Reeves v. Churchich*, 484 F.3d 1244 (10th Cir. 2007) (areas of outside individual units of duplex not "curtilage" with respect to either unit if shared with occupants of other unit); see also *State v. Williams*, 862 N.W.2d 831, 838 (N.D. 2015) (interest in common hallway was not exclusive and therefore the hallway "was not curtilage"); *State v. Nguyen*, 841 N.W.2d 676, 682 (N.D. 2013) (even though the main entrances were locked and secured at all times and officer gained entry by catching the door after another person gained entry, there was no search under *Jardines* where dog alerted to drugs within a particular apartment because the curtilage "concept is significantly modified when applied to a multifamily dwelling.").

¶ 114    Unlike in *Jardines*, the area in question here did not belong to defendant, nor did she have exclusive control over it, and there was therefore no trespass as far as defendant was concerned. Everyone understands that tenants of an apartment building do not own or possess the common areas. The majority's analysis ignores that a large amount of people that defendant has no control over have access to the common areas outside of defendant's apartment door; the list includes the occupants of the other 11 apartments and anyone they let in, plus the landlord and anyone he lets in, plus anyone who is let in by someone who is already inside.

- 34 -

¶ 115    The majority makes much of the notion that the area behind the locked common door was not readily accessible to the public. Aside from being irrelevant, this does not even appear to be true, as Officer Mecum, who went to the unit in plain clothes, was let into the building by another tenant after simply knocking on the door. The officer also no doubt could have easily gained access by following an occupant through the door before it latched. See *Nguyen*, 841 N.W.2d at 678-79 (officer gained access to the secured building by catching the door as an unidentified female either exited or entered); see also 1 Wayne R. LaFave, Search and Seizure § 2.3(c), at 59 n.145.70 (5th ed. Supp. 2015) (discussing *Nguyen*, 841 N.W.2d at 682, as holding that because of the lack of any expectation of privacy in the area outside of one's apartment door, "the curtilage 'concept is significantly modified when applied to a multifamily dwelling' "). At any rate, the concept of curtilage does not apply to an area that is not within a resident's property rights.

¶ 116    For the same reason, it is irrelevant that the visit by Officer Cervantes and Hunter occurred "in the middle of the night." Justice Kilbride quotes language from Justice Alito's dissent in *Jardines*: "The officer 'adhered to the customary path; he did not approach in the middle of the night; and he remained at the front door for only a very short period (less than a minute or two).' " *Supra* ¶ 43 (quoting *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1423 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.)). But this language quoted from the *Jardines* dissent—that is now relied upon by Justice Kilbride—was written to show that the officers in *Jardines* had a license or an implied invitation to enter onto the curtilage of Jardines's property to conduct a dog sniff *despite* the area being curtilage. The quoted language was not written, as Justice Kilbride apparently surmises, to settle a dispute as to whether the area in question was in fact curtilage. All nine justices in *Jardines* agreed that the porch owned by the defendant in that case was curtilage. In contradistinction to *Jardines*, the fact that the dog sniff in the present case occurred in the common area outside of any area belonging to defendant makes the time of day irrelevant because the area was not curtilage and therefore a license was not required to satisfy the fourth amendment.

¶ 117    Another reason that the majority suggests for finding the common area of the landing to be curtilage is based on the four factors set forth in *United States v. Dunn*, 480 U.S. 294, 301 (1987). There, the Court stated that curtilage questions should be resolved with particular reference to four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put;

and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* The Court cautioned that it was not suggesting "that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

¶ 118    The majority calls the *Dunn* factors a "test" and concludes that all four weigh in favor of finding that the landing was the curtilage of defendant's apartment. *Supra* ¶¶ 34, 37. At the outset, I question the sufficiency of the *Dunn* factors to determine whether a dog sniff in a common area of a multiunit dwelling is a search where the tenants have a lessened expectation of privacy in such areas by virtue of their neighbors and others' right to use or occupy the same common area. See *State v. Williams*, 2015 ND 103, ¶ 24, 862 N.W.2d 831 ("An analysis of the *Dunn* factors regarding curtilage, alone, is insufficient to determine whether the drug sniff was a search; a reasonable expectation of privacy analysis must also be conducted. It is undisputed Williams [as a condominium owner] has a property interest in the hallway, but his interest is not exclusive. *** [T]he common hallway of the condominium building was available for the use of the other co-owners and their guests and others having legitimate reasons to be on the premises, and Williams cannot unilaterally exclude individuals from the area because his co-owners also have a property interest in the shared space. [Citation.] *** [W]e conclude the condominium building's common hallway was not curtilage, and Williams had no reasonable expectation that the shared space would be free from any intrusion."). Also, I would note that the United States Supreme Court has never used the *Dunn* factors to find that an area not belonging to defendant's home can be his curtilage. See generally 1 Wayne R. LaFave, Search and Seizure § 2.2(g), at 50; § 2.3(c), at 55 (5th ed. Supp. 2015).

¶ 119    In any event, I disagree with the majority's application of the *Dunn* factors and would reach the exact opposite conclusion, finding that all four factors weigh in favor of finding that the common landing area was not curtilage.

¶ 120    With respect to the first factor, the majority finds that the proximity of the landing to defendant's apartment strongly supports an inference that the landing be treated as curtilage. I would not weigh this factor in favor of a finding of curtilage

in this case, however, because the landing was not on defendant's property and she had no property right in it. And, although it was close to defendant's apartment, it was also close to another apartment and a storage area.

¶ 121    The remaining three factors all weigh heavily against the conclusion that the common landing belonged to the apartment's curtilage. The area was not included within an enclosure that excluded others—any of the tenants of the building, the landlord, their invitees and the officers in this case could have accessed the landing and defendant could not exclude them. See *People v. Lyles*, 332 Ill. App. 3d 1, 7 (2002) (no reasonable expectation of privacy in apartment building common area); *State v. Nguyen*, 2013 ND 252, 841 N.W.2d 676 (post-*Jardines* case where court found that a dog sniff in the common area of a locked apartment building where dog alerted on the defendant's apartment door was not a search because defendant did not have a reasonable expectation of privacy in the area and it was therefore not curtilage); *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010) (dog sniff of exterior doorframe of defendant's apartment that occurred in common hallway did not constitute a search because the sniff occurred in the common area where others could be lawfully present); *cf. United States v. Burston*, 806 F.3d 1123 (8th Cir. 2015) (post-*Jardines* case that accepted the holding of *Scott*, distinguishing it from the facts before it, which the *Burston* court characterized as involving the search of an *uncommon area* six to ten inches from Burston's window, which was prevented from being a common area by a strategically placed bush and grill). In the present case, there is no evidence that defendant put the landing to any use other than accessing her apartment. Nor was there any evidence that her lease permitted any other use or that any other use was feasible in light of the landing's size and design. Under these circumstances, the landing was not curtilage under the factors enunciated in *Dunn*.

¶ 122    Justice Kilbride concludes his analysis on whether the landing should be treated as curtilage by making the puzzling claim that "[e]ven the *Jardines* dissent made observations that support our conclusion that the police conduct in this case violated the fourth amendment." *Supra* ¶ 42. Justice Kilbride's claim is a real head-scratcher because the issue in *Jardines* was whether the front porch of defendant's home was curtilage, not whether the common area of an apartment building can be curtilage. Justice Kilbride's claim becomes all the more startling, however, given that the dissenters in *Jardines* actually told us how they felt about a dog sniff of a common area of an apartment building:

"The concurrence suggests that a *Kyllo*-based decision would be 'much like' the actual decision of the Court, but that is simply not so. The holding of the Court is based on what the Court sees as a ' "physical intrusion of a constitutionally protected area." ' [Citation.] As a result, *it does not apply when a dog alerts *** in the corridor of a building to which the dog and handler have been lawfully admitted.*

The concurrences's *Kyllo*-based approach would have a much wider reach. When the police used the thermal imaging device in *Kyllo*, they were on a public street, 533 U. S., at 29, and 'committed no trespass.' *Ante*, at 3. Therefore, if a dog's nose is just like a thermal imaging device for Fourth Amendment purposes, a search would occur *if a dog alerted while on a public sidewalk or in the corridor of an apartment building*. And the same would be true if the dog was trained to sniff, not for marijuana, but for more dangerous quarry, such as explosives or for a violent fugitive or kidnaped child. *I see no ground for hampering legitimate law enforcement in this way*.

***

The conduct of the police officer in this case did not constitute a trespass and did not violate respondent's reasonable expectations of privacy. I would hold that this conduct was not a search ***." (Emphases added.) *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1426 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 123   The special concurrence of Chief Justice Garman in this case also finds the common area of the landing and the exterior of defendant's doorway to be curtilage. *Supra* ¶ 99. Chief Justice Garman sets forth two fourth amendment purposes at play in considering whether an area should be considered curtilage and urges that "[t]he protection claimed by defendant in this case fits neatly within the home-shielding curtilage cases." *Supra* ¶ 93. But in the end it is clear that her determination that the common area at issue in this case should be treated as the curtilage of the apartment rests upon an egalitarian concern for creating privacy rights for apartment dwellers on par with the occupants of single-family homes regardless of the significant legal differences between the two situations. See *supra* ¶ 96 ("Were this court to hold that an apartment uniformly lacks fourth amendment curtilage, we would additionally hold that those who live in apartments have less property-based fourth amendment protection *within* their homes than those who

live in detached housing."). The problem with the special concurrence's approach is that apartment doors that open to common areas of a multiunit apartment building have less home-shielding protection by nature than single-family home properties do. Odors, sounds and activities may be detected from the vantage point of the common areas of the apartment building where others may not be excluded.[4] I would submit that the reaction to this reality should not lie in morphing the concept of curtilage beyond its rightful parameters.

¶ 124                  III. No Reasonable Expectation of Privacy

¶ 125      Having concluded that the common stairway and landing of the apartment complex is not the curtilage of defendant's apartment, I would also find that defendant did not have a reasonable expectation of privacy in the odors that waft from inside her apartment to places that others may lawfully stand. The overwhelming weight of federal authority is in agreement with that proposition. See *United States v. Scott*, 610 F.3d 1009, 1015-16 (8th Cir. 2010) (dog sniff of exterior door frame of defendant's apartment door occurring in common hallway did not violate defendant's reasonable expectation of privacy); *United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993) (holding that defendant had no reasonable expectation of privacy in the common area of a secured apartment building); *United States v. Acosta*, 965 F.2d 1248 (3d Cir. 1992) (same result with unsecured building); *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991) (same); *United States v. Holland*, 755 F.2d 253 (2d Cir. 1985) (same result with secured building); *United States v. Eisler*, 567 F.2d 814 (8th Cir. 1977) (same); *United States v. Cruz Pagan*, 537 F.2d 554 (1st Cir. 1976) (holding that defendant had no reasonable expectation of privacy in parking garage of condominium). The Sixth Circuit appears to be the only circuit that recognizes a reasonable expectation of

---

[4]Chief Justice Garman leaves it somewhat ambiguous as to the extent of the area she would find to be constitutionally protected. At one point, she states that "where officers carry out a canine sniff of the door to an apartment or other dwelling unit over which the defendant has exclusive control, a search is being carried out." *Supra* ¶ 97. Later, she states it is the "front door and area immediately surrounding it" (*id.*), and the "front door and landing" (*id.* ¶ 99) that are constitutionally protected. I simply disagree that the landing or any of the area outside of defendant's door was under defendant's exclusive control in this case. Moreover, there is no evidence in the record that Hunter was actually allowed to touch defendant's door with his nose. Additionally, it may be possible that a trained officer can tell if the dog was alerting to the presence of drugs before its nose hits the door or it begins to scratch it. At any rate, I would not find the exterior of the apartment door to be curtilage.

privacy in the hallway or common areas of a locked apartment building. See *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976). The majority position among the states that have considered the question also appears to be solidly in favor of finding that there is no reasonable expectation of privacy in the common areas of a locked apartment building. *State v. Nguyen*, 2013 ND 252, ¶ 9, 841 N.W.2d 676 (collecting cases); *State v. Davis*, 732 N.W.2d 173 (Minn. 2007).

¶ 126    The rationale for holding that there is no legitimate expectation of privacy that protects a renter from a dog sniff in the common area of an apartment building outside the renter's door has been set forth in numerous cases. The rejected arguments of the defendants in those cases were along the lines that the defendants' privacy interest inside their residences was intruded upon because police conducted dog sniffs to detect something therein. The defendants usually relied upon *Kyllo v. United States*, 533 U.S. 27 (2001), where the Supreme Court found that law enforcement's use of a thermal imaging device outside the home, but directed into the home, was a search for fourth amendment purposes.

¶ 127    Courts have responded by noting that no legitimate expectation of privacy is violated by police conduct that can reveal only information about contraband and nothing about arguably private rights. *United States v. Jacobsen*, 466 U.S. 109, 123-24 (1984); *United States v. Place*, 462 U.S. 696, 707 (1983) (canine inspection of luggage at airport). Drug-sniffing dogs, unlike thermal imaging devices, are not "capable of detecting lawful activity" such as the "intimate details" in the home. *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005) (canine inspection of an automobile during a traffic stop) (clarifying *Kyllo*). The resident's interest in the inside of his dwelling was intruded in *Kyllo* because the device used was capable of detecting lawful as well as unlawful activity going on inside the residence. Here, defendant does not make any claim that the dog used outside her apartment was capable of detecting anything beyond the odor of illegal drugs emanating from inside the apartment to the outside. A dog sniff does not expose noncontraband that would otherwise remain hidden from public view, but "discloses only the presence or absence of narcotics." *Place*, 462 U.S. at 707. A dog sniff is considered *sui generis* because there is "no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id. Kyllo* is therefore distinguishable, and it can be easily concluded that the likelihood that the use of a drug-sniffing dog in the common area of an apartment building will compromise any interest in privacy

is too remote to characterize the use of the dog as a violation of a reasonable expectation of privacy. See *Caballes*, 543 U.S. at 409-10.

¶ 128 I would also note that the purpose of an apartment building having locking exterior doors leading into the common areas is not to provide privacy, but to provide safety for the tenants. *Eisler*, 567 F.2d at 816. In other words, locked common doors are meant to keep the crime out, not the police out. If there were no murders, rapes or robberies in the world, the current fashion of automatic-locking apartment doors would likely disappear. "An expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions." *Id.* Here, it is clear that others—including the landlord, other tenants and their invitees—had the right to use the common stairwell, including the third-floor landing outside defendant's apartment door. Accordingly, the officer's entry into that area with Hunter did not violate any reasonable expectation of privacy and was not a search.

¶ 129 Finally, I address the special concurrence's statement "that another resident may grant police entry to the common areas of the apartment building, but nothing indicates defendant's fellow residents may give the police license to carry out a dog sniff" near defendant's door. *Supra* ¶ 97. As I have already explained, the dog sniff occurred in the common area of the third-floor landing that cannot be considered curtilage and there was no reasonable expectation of privacy, and therefore no license was required. I might add, however, that apartment dwellers living in close quarters with drug dealers or manufacturers would no doubt prefer to see an occasional police dog in their common hallway. The same would be even more true "for more dangerous quarry, such as explosives or for a violent fugitive or kidnaped child." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1426 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.). The majority is wrongly foreclosing this useful and legitimate law enforcement tool.

¶ 130                                    IV. Conclusion

¶ 131 I would hold that the use of the drug-sniffing dog in the common area outside of defendant's apartment door did not constitute a trespass onto the curtilage and was not a violation of defendant's reasonable expectation of privacy. The police therefore did not conduct an illegal search, and there was no violation of the fourth amendment. Accordingly, I dissent.

¶ 132        JUSTICE KARMEIER joins in this dissent.