2020 IL App (2d) 190465-U
No. 2-19-0465
Order filed January 8, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-82 |
| | ) | |
| JODI P. LAMPI, | ) | Honorable |
| | ) | Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The State proved defendant guilty beyond a reasonable doubt of obstructing justice, as the trial court, applying the proper legal standard, was entitled to find that defendant's false information materially impeded a police investigation.

¶ 2     Defendant, Jodi P. Lampi, appeals her conviction of obstruction of justice (720 ILCS 5/31-4(a)(1) (West 2016)) in the circuit court of De Kalb County, contending that the trial court applied the wrong legal standard and that the evidence was insufficient.  Because the court applied the correct standard and the evidence proved defendant guilty beyond a reasonable doubt, we affirm.

¶ 3                             I. BACKGROUND

¶ 4    Defendant was indicted on one count of obstruction of justice (720 ILCS 5/31-4(a)(1) (West 2016)).[1]  Defendant opted for a bench trial.

¶ 5    The following facts were established at the trial.  Defendant owned a dog named Meeko. Mindy Brown provided dog daycare services.  From September 2017 into October 2017, defendant left Meeko with Brown for two days per week.

¶ 6    On October 22, 2017, defendant came to Brown's home to join Brown and her family on an outing to an apple orchard.  When Brown asked defendant how Meeko was doing, defendant told her that he had been stolen.  Defendant explained that she had given Meeko to Kristi Foster for a one-week trial and that Foster had refused to return the dog.  Brown described defendant as very upset.

¶ 7    Defendant told Brown that she had contacted the police and family members, but that no one would help her recover Meeko.  According to Brown, defendant gave her Foster's address and asked her to keep an eye out for Meeko and to contact her if she were to see Meeko.

¶ 8    After defendant left, Brown drove to Foster's home.  She saw a little girl walking Meeko on a leash on the sidewalk.  Brown exited her vehicle and asked the girl if she could see Meeko. When Meeko walked up to Brown, she grabbed him and drove away.

¶ 9    Shortly thereafter, Brown texted defendant to say that she had Meeko.  According to Brown, defendant texted her that she was on her way.  About 15 to 20 minutes later, defendant

---

[1] The original indictment did not allege that defendant intended to prevent the apprehension of a person.  After the trial court dismissed the indictment, the State filed an amended indictment that added an allegation that defendant intended to interfere with the apprehension of Mindy Brown.

arrived at Brown's home.  Defendant gave her a $1000 check for recovering Meeko.  Although Brown refused the check, her spouse accepted it.  Brown never cashed the check.

¶ 10     When defendant left, she did not take Meeko.  Instead, she told Brown that she would return in the morning and would take Meeko to Michigan to be with defendant's partner and their daughter.  Defendant left no later than 8 p.m.

¶ 11     According to Brown, at around 10 p.m. that evening, defendant called her to say that the police had been at her house and that she was concerned.  Defendant wanted to take Meeko, drop him off on Foster's doorstep, ring the doorbell, and leave.  Because Brown had been sleeping when defendant called, she told defendant that she would see her in the morning.  According to Brown, defendant told her to delete her text messages.  She also told Brown not to cash the check and that she would bring cash.  Brown admitted that defendant never told her in advance that she would give her $1000 if she returned Meeko.

¶ 12     About 1 a.m. the following morning, the police arrived at Brown's residence.  Brown was later charged with the theft of Meeko and was accepted into a felony-diversion program.

¶ 13     According to Foster, while she was at a YMCA, an acquaintance showed her a photo of Meeko and told her that his owner wanted to get rid of him.  Foster asked for the owner's phone number.  Foster then contacted defendant about adopting Meeko.

¶ 14     On October 11, 2017, Foster went to defendant's home to meet Meeko.  Foster, who lived only a few minutes away in an adjacent subdivision, left with Meeko.  Defendant provided some of Meeko's toys, treats, and veterinary records.

¶ 15     Approximately two days later, Foster texted defendant a photo of Meeko with Foster's children.  She did so to show defendant that Meeko was happy.  When Foster asked defendant how

she was doing, defendant said that she was terribly sad. When Foster asked her if she wanted Meeko back, defendant said no, but that she might visit him sometime.

¶ 16    About a week later, defendant sent Foster a message via Facebook. Defendant said that she was sad and would like Meeko back. Because her children had become attached to Meeko, Foster declined to return the dog.

¶ 17    Thereafter, defendant kept texting Foster about returning Meeko. Around October 17, 2017, the police came to Foster's home to investigate a report that Meeko had been stolen. Officer Reda Reese of the De Kalb Police Department met with Foster. Foster showed Officer Reese the text messages between Foster and defendant. Officer Reese told Foster that she did not believe that Foster stole Meeko, and Officer Reese said that she would tell defendant that Meeko was in a safe place. Officer Reese left without taking Meeko.

¶ 18    On October 22, 2017, Foster's daughter was walking Meeko in front of their house. After someone took the dog from her daughter, Foster called 911. Although she told the dispatcher that defendant had stolen Meeko, she admitted that she had not seen defendant do so and had assumed that it was defendant. According to Foster, pursuant to civil litigation between her and defendant, Meeko was returned to defendant.

¶ 19    On October 22, 2017, at about 5 p.m., Officer Danielle Sorenson of the De Kalb Police Department went to Foster's home to investigate a theft. Foster told her that her daughter had been walking the dog when an unknown female took the dog. Foster told Officer Sorenson that there had been an ongoing dispute with defendant regarding the ownership of the dog.

¶ 20    At about 6:30 p.m. on that date, Officer Sorenson arrived at defendant's home, but defendant was not there. At around 9 p.m., Officer Sorenson returned and met with defendant. When Officer Sorenson asked defendant if she knew why she was there, defendant answered that

it was because of the dog. Defendant told Officer Sorenson that she was having an ongoing dispute with Foster about ownership of the dog. According to Officer Sorenson, defendant did not seem surprised when she told defendant that someone had taken the dog from Foster's daughter. When Officer Sorenson asked defendant if she knew who might have taken the dog, defendant answered no. Defendant told Officer Sorenson that she had told her partner and her family members who lived in Michigan about the dog dispute. When Officer Sorenson asked defendant again, defendant repeated that she did not know who had taken the dog.

¶ 21    After telling Officer Sorenson that she had been texting her partner all day, she agreed to let Officer Sorenson look at her cell phone. When Officer Sorenson did so, she found no texts regarding the dog. Officer Sorenson assumed that defendant had deleted any such texts.

¶ 22    At about 9:45 p.m., after meeting with defendant, Officer Sorenson went to the police station to continue her investigation. Between 9:45 and 11 p.m., she tried to develop leads based on the information defendant had provided. For example, she examined the Facebook page of defendant and defendant's partner to see if the partner drove a vehicle that matched the description of the one provided by Foster. Officer Sorenson also looked at defendant's family members' Facebook pages to see if any family members might have been in the area when the dog was taken. She also used an internal database to try to identify defendant's other associates.

¶ 23    At about 11 p.m. on October 22, 2017, Foster contacted Officer Sorenson and told her that Brown might have taken the dog. At about 1:17 a.m. the next morning, Officer Sorenson and her partner went to Brown's home. Officer Sorenson found the dog there and returned him to Foster.

¶ 24    Later, in the early morning of October 23, 2017, the dispatcher advised Officer Sorenson that defendant wanted to speak to her. Officer Sorenson returned to defendant's home. According to Officer Sorenson, defendant volunteered that she had told Brown about the dog, where Foster

lived, and that if Brown saw the dog on a public way she should take him. Defendant also told Officer Sorenson that Brown said that she would canvass the area where Foster lived.

¶ 25    On cross-examination, Officer Sorenson admitted that defendant consented to a search of her cell phone and that she could have looked at whatever she wanted. Officer Sorenson denied that defendant offered to let her look at her laptop and offered to show her her Facebook account. Officer Sorenson admitted that she did not include in her written report that, because of defendant's statements, she followed false investigative leads. Nor did she mention in her report that she had engaged in any investigation between her meeting with defendant and Foster's report that Brown had taken the dog. Officer Sorenson admitted that it was not until August 9, 2018, that she first advised the prosecutor about the investigation that she conducted between meeting with defendant and hearing from Foster. She did so only because the prosecutor had asked her for more details. She also admitted that Foster and she were Facebook friends, but they were not otherwise friends.

¶ 26    Defendant testified that in October 2017, because of concerns about her workload, she had considered giving away Meeko. On October 11, 2017, Foster came to defendant's home to discuss Meeko. According to defendant, because she was not sure that she wanted to part with Meeko, Foster took him home for a one-week trial.

¶ 27    During the following week, defendant asked Foster, via Facebook messenger, to return Meeko. Foster refused. On October 17, 2017, defendant reported to the De Kalb police that Meeko had been stolen. Defendant told Officer Reese about the situation and that Foster would not return Meeko. About a week later, defendant met Officer Reese at the police station to discuss the status of the investigation. According to defendant, Officer Reese told her that it was a civil matter and asked if Foster could do anything to make defendant feel better. Defendant responded that Foster could return Meeko.

¶ 28    Defendant denied asking Brown to take Meeko or that Brown said that she would. After Brown notified her that she had recovered Meeko, defendant went to Brown's home. Defendant left Meeko there, because she had been bothered by what Brown had done.

¶ 29    Although defendant admitted telling Officer Sorenson that she did not know who had taken Meeko, she did so because she was a "little bit in shock and a little bit terrified of what happened and [she] was trying to wrap [her] brain around it." She denied intending to prevent the apprehension of Brown.

¶ 30    Defendant gave Officer Sorenson permission to examine her cell phone. The phone was not locked. When Officer Sorenson examined the phone, she asked defendant who certain people were. Defendant said that one was her partner and others were defendant's family members who lived in Michigan. According to defendant, Officer Sorenson never asked for their last names or phone numbers. Defendant also offered to let Officer Sorenson look at her Facebook account on her laptop, but she declined. When Officer Sorenson asked defendant who knew about the dispute between her and Foster, defendant told her that her partner and family did.

¶ 31    Early the following morning, defendant asked to meet with Officer Sorenson. When Officer Sorenson arrived at her home, defendant told her that Brown had taken Meeko. Officer Sorenson told defendant that Brown had already been arrested and that Meeko had been returned to Foster. Defendant admitted that, when she told Officer Sorenson that she did not know who had taken Meeko, she knew that Brown had done so.

¶ 32    On cross-examination, defendant admitted that, while initially meeting with Officer Sorenson, it had occurred to her to tell the truth about Brown having the dog.

¶ 33    During closing argument, the prosecutor asserted that defendant provided false information that materially impeded the administration of justice.

¶ 34    The trial court found, among other things, that after initially speaking with defendant, Officer Sorenson continued to investigate from 9:45 to 11 p.m.  In doing so, she tried to determine if defendant's partner drove a vehicle matching the description of the suspect's, she looked at Facebook to determine if anyone associated with defendant had been in the area of Foster's home or if there were any conversations about the dog on defendant's Facebook page, and she used an internal database to identify associates of defendant.  The court expressly found that the State's witnesses were credible and that, because of defendant's evasiveness and vague answers, she was not credible.

¶ 35    The trial court ruled that the State was required to prove two positions: (1) that defendant knowingly furnished false information and (2) that she did so to prevent the arrest of Brown.  The court found that both elements had been proved beyond a reasonable doubt.  The court explained that all that defendant needed to do was to tell Officer Sorenson initially that Brown had the dog, but instead she sent Officer Sorenson "on a wild goose chase, trying to determine the type of car her partner ha[d], getting on Facebook, trying to see about other leads that might be there, [and] giving Officer Sorenson her phone so she could look at it, even though she [knew] it [did not] contain any information that might lead to the finding of the dog Meeko."

¶ 36    Defendant, in turn, filed a motion for a new trial.  In denying that motion, the trial court noted that, although it did not say it as clearly as it should have, it had found at trial that defendant's false statements to Officer Sorenson materially impeded the investigation.  Defendant then filed a timely notice of appeal.

¶ 37                                          II. ANALYSIS

¶ 38    On appeal, defendant contends that (1) the trial court, in finding her guilty, applied the wrong legal standard and (2) the evidence was insufficient to prove her guilty beyond a reasonable doubt.

¶ 39    We first address whether the trial court applied an incorrect legal standard. It did not.

¶ 40    This court has held that, in a prosecution for obstruction of justice based on the furnishing of false information, the State must prove that a defendant furnished false information and that she did so intending to prevent the apprehension of a person. *People v. Taylor*, 2012 IL App (2d) 110222, ¶ 17. More importantly, we held that such false information must materially impede the investigation. *Taylor*, 2012 IL App (2d) 110222, ¶ 17. In so holding, we relied on two supreme court cases: *People v. Baskerville*, 2012 IL 111056, and *People v. Comage*, 241 Ill. 2d 139 (2011). In *Baskerville*, the court held that, in a prosecution for obstructing a peace officer (720 ILCS 5/31-1(a) (West 2006)), the State must prove that a false statement actually impeded an act that a peace officer was authorized to perform. *Baskerville*, 2012 IL 111056, ¶ 35. In *Comage*, the court held that, in a prosecution for obstruction of justice based on concealing evidence, the State must prove that the concealment materially impeded a police officer's investigation. *Comage*, 241 Ill. 2d at 150. Although neither case directly addressed whether, in a prosecution for obstruction of justice based on providing false information, the State must prove that the false information materially impeded the police investigation, we read those cases as supporting our conclusion that such proof was required. *Taylor*, 2012 IL App (2d) 110222, ¶¶ 10-17. Thus, the law in this district was established in *Taylor* and it applied in this case.[2]

---

[2] We note that the Fifth District has declined to follow *Taylor* and has held that, in a prosecution for obstruction of justice based on false information, there is no requirement to prove

¶ 41    Having identified the correct legal standard, we next determine whether, in finding defendant guilty, the trial court applied that standard. In doing so, we presume that the court knew and followed the law, unless the record shows otherwise. *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996). Here, the record clearly shows that the court applied the correct legal standard.

¶ 42    The indictment was amended for the purpose of including an allegation that defendant intended to prevent the apprehension of Brown. Further, the prosecutor argued in closing that defendant provided false information that materially impeded the administration of justice. Additionally, although the court, in finding defendant guilty, did not use the phrase "materially impede," it found that defendant had sent Officer Sorenson on a wild goose chase by falsely denying that she knew who had taken Meeko. The court added that, because of defendant's refusal to tell the truth, Officer Sorenson was forced to spend almost two hours trying to develop leads. Thus, the court was keenly aware of the need to find that defendant's false information to Officer Sorenson materially impeded her investigation.

¶ 43    Moreover, in ruling on defendant's motion for a new trial, the trial court expressly noted that, although it did not articulate the standard as clearly as it should have, it had found at trial that defendant's false statements to Officer Sorenson materially impeded the investigation. That comment confirmed that the court had applied the correct legal standard.

¶ 44    Although defendant points to the trial court's reference to cases that predated *Taylor* and did not contain the material-impediment requirement, the trial court also referred to *Taylor*, *Baskerville*, and *Comage* in finding that defendant had materially impeded the investigation. The

_____

a material impediment. See *People v. Gordon*, 2019 IL App (5th) 160455, ¶ 27. However, we need not follow a case from another district. See *People v. Burns*, 2016 IL 118973, ¶ 65.

court's reference to those earlier cases does not show that it did not understand the correct legal standard.[3]

¶ 45    We next address whether defendant was proved guilty beyond a reasonable doubt. She was.

¶ 46    In any challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Taylor*, 2012 IL App (2d) 110222, ¶ 8 (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence is the responsibility of the trier of fact. *Taylor,* 2012 IL App (2d) 110222, ¶ 8. That standard applies to both direct and circumstantial evidence and to both bench and jury trials. *Taylor*, 2012 IL App (2d) 110222, ¶ 8.

¶ 47    Here, defendant contends only that the State did not prove that the false information she provided to Officer Sorenson materially impeded the investigation. We disagree.

¶ 48    The evidence established that, when Officer Sorenson first met with defendant, defendant was fully aware that Brown had taken Meeko. Had defendant simply told Officer Sorenson that fact, the investigation would have quickly concluded. Instead, when asked several times if she knew who had taken Meeko, defendant lied to Officer Sorenson. Further, by mentioning that her

---

[3] Even had the trial court applied the wrong legal standard, we could affirm its judgment under the proper standard, if supported by the record. See *People v. Lee*, 2016 IL App (2d) 150359, ¶ 14 (appellate court may affirm on any basis supported by the record, regardless of whether the trial court's reasoning was correct).

partner and family members knew about the dispute with Foster, she falsely suggested to Officer Sorenson that either her partner or a family member might have been involved. The false information caused Officer Sorenson to continue to investigate to try to develop and pursue leads. In doing so, Officer Sorenson spent nearly two hours checking online information to identify potential suspects. As the trial court aptly described it, defendant sent Officer Sorenson on a wild goose chase.

¶ 49    Defendant makes much of Officer Sorenson's failure to further examine defendant's cell phone or her laptop to identify suspects. However, doing so would have been equally fruitless. Whether Officer Sorenson spent her time pursuing false leads in defendant's home or at the police station, her investigation would have been materially impeded by defendant's false denial of knowing who had taken the dog.

¶ 50    Defendant also asserts that Officer Sorenson's testimony was impeached, because she did not mention the additional investigative work in her original police report or her complaint for an arrest warrant. Although that might have been potentially impeaching, the trial court expressly found Officer Sorenson credible. That finding uniquely belonged to the trial court. See *Taylor*, 2012 IL App (2d) 110222, ¶ 8.

¶ 51    When we view the evidence in the light most favorable to the prosecution, we conclude that defendant was proved guilty beyond a reasonable doubt of obstructing justice.

¶ 52                                III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 54    Affirmed.